S13G0178. WILLIAMS v. THE STATE.
(750 SE2d 355)

NAHMIAS, Justice.

Appellant James Kemp Williams was charged with driving under the influence and violation of the open alcohol container law after he was stopped and arrested by Bibb County Sheriff's officers at a vehicle checkpoint. Appellant filed a motion to suppress evidence obtained as a result of his stop on the ground that the roadblock violated the Fourth Amendment. The trial court denied the motion, and on interlocutory appeal, the Court of Appeals affirmed. See *Williams v. State*, 317 Ga. App. 658 (732 SE2d 531) (2012). We granted Appellant's petition for certiorari, posing the question: "Did the Court of Appeals employ the correct legal analysis in assessing whether the decision to implement the roadblock was made by supervisory personnel rather than field officers, for a legitimate primary purpose?"

In *Brown v. State*, 293 Ga. 787 (750 SE2d 148) (2013), which posed the same question and which we also decide today, we discuss in detail the legal analysis that Georgia courts should use in evaluating a constitutional challenge to an initial stop at a police checkpoint. See id. at 791-800. Applying that analysis here, we defer to the trial court's factual finding that the sergeant who authorized the checkpoint at which Appellant was stopped properly made the decision to implement that roadblock in advance as a supervisor and not while acting as an officer in the field. However, the trial court erred in denying Appellant's motion to suppress, because the State failed to prove that the Bibb County Sheriff's Office ("BCSO") roadblock *program* had an

appropriate primary purpose other than advancing the general interest in crime control, as required by *City of Indianapolis v. Edmond*, 531 U. S. 32, 42 (121 SCt 447, 148 LE2d 333) (2000). See *Brown*, 293 Ga. at 794-798. It follows that the Court of Appeals erred in upholding the trial court's ruling.

1. At the suppression hearing on July 11, 2011, Appellant introduced into evidence a two-page excerpt from the Law Enforcement Operations Manual of the BCSO that contains the following provision:

> **Vehicle roadblocks** — Vehicles may also be stopped at general roadblocks which serve legitimate law enforcement purposes. If evidence of a crime is observed, an officer has the right to take reasonable investigative steps.

Captain Harry Colbert, the BCSO's commander of specialized operations, testified without contradiction that this provision of the operations manual was the BCSO's "official policy" regarding checkpoints and that the BCSO had no other written policy, procedure, memorandum, or order concerning checkpoints. In addition to Captain Colbert, the State presented the testimony of Sergeant Bruce Jordan and Deputy Robert Scarborough, two of the three officers who participated in the checkpoint at which Appellant was stopped. The trial court also reviewed a recording of Sergeant Jordan's interaction with Appellant at the checkpoint that was made by audio-visual recording equipment in Sergeant Jordan's police car. Appellant cross-examined the State's witnesses but did not present any witnesses of his own.

Captain Colbert testified that in September 2009, Jordan was promoted to the rank of sergeant and put in charge of the state-subsidized Highway Enforcement of Aggressive Traffic ("HEAT") Unit, which consisted of three officers, including Sergeant Jordan. At that time Captain Colbert verbally delegated to Sergeant Jordan the authority to implement checkpoints. The captain said that he instructed Sergeant Jordan not to implement checkpoints on the interstate or during rush-hour traffic but otherwise placed no limitations on Sergeant Jordan's authority to implement roadblocks anywhere in Bibb County anytime during his shift. Captain Colbert also said that Sergeant Jordan was not required to seek prior authorization for particular checkpoints or to document after the fact the checkpoints that he implemented, and Sergeant Jordan confirmed that he did not do so. Captain Colbert described Sergeant Jordan, whose usual shift was 7:00 p.m. to 3:00 a.m., as a "field supervisor" who was "on patrol," drove a marked car, wrote traffic citations, and spent most of his working hours in the field.

Captain Colbert also testified, as did Sergeant Jordan, that the BCSO has a form for roadblocks that lists the purpose, time, location, and officers present, but the form normally was used only for large-scale operations or joint operations with other law enforcement agencies, and it was up to Sergeant Jordan to decide whether to use the form for a checkpoint conducted solely by the HEAT Unit. Captain Colbert and Sergeant Jordan said that decisions regarding the date, time, location, duration, staffing, and number of checkpoints were left to Sergeant Jordan alone. According to Sergeant Jordan and Deputy Scarborough, for at least a year, the sergeant and his HEAT Unit conducted multiple checkpoints in Bibb County each week, sometimes several in a single night.

Regarding the checkpoint at which Appellant was stopped, Sergeant Jordan testified that on the evening of November 26, 2010, which was a Friday, he decided at the beginning of his shift or right as he was coming on shift to have his unit conduct a sobriety and license checkpoint in downtown Macon on Washington Avenue at Orange Street. According to both Sergeant Jordan and Deputy Scarborough, at least an hour before the checkpoint began, Jordan contacted Scarborough and the other deputy in the unit by cell phone and instructed them to meet him at that location. Sergeant Jordan said that he did not consult with the deputies before making the decision about where and when to conduct the checkpoint, which started at around 12:30 a.m. on Saturday, November 27, and ended at around 3:00 a.m. when Sergeant Jordan left the scene.

Sergeant Jordan and Deputy Scarborough testified that the checkpoint was identified with a sign for drivers coming from the direction of the bars in downtown Macon as well as three parked patrol cars with their blue roof lights illuminated but not flashing. According to Deputy Scarborough, Sergeant Jordan and the two deputies wore bright yellow police jackets with reflective tape on them. Sergeant Jordan and Deputy Scarborough testified that Jordan acted as the on-scene supervisor and that the deputies acted as screeners, asking drivers for their license and proof of insurance. Sergeant Jordan said that every vehicle that passed through the checkpoint was stopped briefly, while Deputy Scarborough clarified that every vehicle was stopped unless traffic backed up, in which case Sergeant Jordan would temporarily shut down the checkpoint and allow the traffic to clear before restarting the checkpoint.

According to Deputy Scarborough, around 2:00 a.m., Appellant approached the checkpoint in his pickup truck and rolled down his window. Deputy Scarborough greeted him and asked to see his driver's license and proof of insurance, which Appellant produced. Deputy Scarborough smelled the odor of alcohol coming from inside

the truck and asked Appellant to blow on a portable breath tester, but he declined. Deputy Scarborough then instructed Appellant to pull over to the shoulder of the road and exit the vehicle so that he could determine whether the odor of alcohol was coming from Appellant's person or from the passenger compartment of the truck, and Appellant complied.

Other vehicles were waiting to be screened, so when Appellant told Deputy Scarborough that "he had had a couple of beers," the deputy walked Appellant over to Sergeant Jordan to perform field sobriety tests to determine if Appellant was safe enough to drive; Deputy Scarborough then went back to screening. Sergeant Jordan testified that he initiated field sobriety tests, which Appellant eventually refused to continue, at which point Sergeant Jordan placed him under arrest. According to Sergeant Jordan, Appellant's arrest was the only one made at the checkpoint.

On November 3, 2011, the trial court entered an order denying Appellant's motion to suppress. The court found that the State met its burden to show that the checkpoint at which Appellant was stopped complied with this Court's decision in *LaFontaine v. State*, 269 Ga. 251 (497 SE2d 367) (1998), which identified five minimum requirements that a particular checkpoint must satisfy to be upheld as constitutional. See id. at 253. The court also found that the checkpoint at which Appellant was stopped was carried out for "a legitimate law enforcement purpose, that is, a sobriety checkpoint," and that the checkpoint was "reasonable under the Fourth Amendment" in view of "the totality of the circumstances." On November 14, 2011, the trial court issued a certificate of immediate review, and on December 13, 2011, the Court of Appeals granted Appellant's application for interlocutory appeal. After the Court of Appeals affirmed the trial court's order denying suppression, see *Williams*, 317 Ga. App. at 658, we granted Appellant's petition for certiorari.

2. As we explain in *Brown v. State*, 293 Ga. 787 (750 SE2d 148) (2013), "where a defendant challenges his initial stop at a police checkpoint by way of a motion to suppress, the State bears the burden of proving that the seizure was constitutional." Id. at 799.

> At a minimum, the State must show that the law enforcement agency's checkpoint program had an appropriate primary purpose other than ordinary crime control — a purpose examined at that programmatic level, rather than by trying to determine the motives of the supervisor who implemented and the officers who conducted the particular checkpoint at issue. See *Edmond*, 531 U. S. at 48. The State must also prove that the particular checkpoint at which the

defendant was stopped was properly implemented and operated — that the five requirements enumerated in *LaFontaine* were met. See 269 Ga. at 253.

*Brown*, 293 Ga. at 799-800. *LaFontaine* requires the State to show that:

[1] the decision to implement the roadblock was made by supervisory personnel rather than the officers in the field; [2] all vehicles [were] stopped as opposed to random vehicle stops; [3] the delay to motorists [was] minimal; [4] the roadblock operation [was] well identified as a police checkpoint; and [5] the "screening" officer's training and experience [was] sufficient to qualify him to make an initial determination as to which motorists should be given field tests for intoxication.

*LaFontaine*, 269 Ga. at 253. See also *Brown*, 293 Ga. at 793-794.

Moreover, compliance with the *Edmond* and *LaFontaine* requirements does not necessarily end the Fourth Amendment analysis of a checkpoint case. See *Brown*, 293 Ga. at 797-798.

The ultimate question remains whether, under the totality of the circumstances, the challenged stop was reasonable. Thus, even if the checkpoint program and the particular checkpoint at which the driver was stopped satisfy the formal requirements, the reviewing court may consider evidence that the checkpoint basis for the stop was pretextual or that the checkpoint was used to harass or was otherwise arbitrary or oppressive.

Id. (citations omitted). Applying these legal principles to the facts of Appellant's case, we conclude that suppression was required.

3. Appellant does not challenge the final four *LaFontaine* requirements, but he argues that the State did not satisfy the first *LaFontaine* requirement and *Edmond*.[1] As the Court of Appeals has done at times, Appellant conflates these two requirements, arguing that the State failed to show that he was stopped "at a checkpoint implemented by a field officer rather than by a supervisor acting at the

---

[1] Appellant also contends that the State failed to show that the stop was reasonable under the totality of the circumstances. However, our reversal based on *Edmond* makes it unnecessary to address that issue.

programmatic level." *Williams*, 317 Ga. App. at 658. See also *Brown*, 293 Ga. at 798-799 (explaining the source of this confusion). *Brown* explains that

> *LaFontaine*'s requirement that the decision to implement a particular roadblock be made by "supervisory personnel" is distinct from *Edmond*'s requirement that the roadblock program have a primary purpose other than the general interest in crime control.

*Brown*, 293 Ga. at 796. The two requirements serve different objectives in the Fourth Amendment analysis and involve different factual inquiries. See id.

> [T]he official who decided to implement the *specific* checkpoint at issue — the focus of the *LaFontaine* inquiry — may not be, and need not be, the official or officials whose primary purpose for establishing the agency's checkpoint *program* must be determined under *Edmond*. . . . [I]n accord with the U. S. Supreme Court's pre-*Edmond* checkpoint cases, *LaFontaine*'s first requirement works to control the potential for arbitrary stops that would exist if every officer in the field could implement a checkpoint by moving the implementation decision up and away from the field to a supervisor. If that supervisor is low-ranking, he may have the authority to implement a particular vehicle checkpoint under *LaFontaine* and his agency's checkpoint program, and the primary purpose of that particular checkpoint may be appropriate. But a low-level supervisor may not always be aware of or able to testify to the primary purpose of the agency's overall checkpoint program, which may have been established and may be overseen by officials at higher levels of the agency. Under *Edmond*, it is at that "programmatic level," 531 U. S. at 48, that the "primary purpose" inquiry must focus, with the goal of ensuring that the agency has not authorized vehicle checkpoints primarily for general crime control but rather for an appropriately limited purpose like traffic safety.
>
> When not conflated, the first *LaFontaine* requirement and *Edmond*'s appropriate primary purpose requirement can be more easily understood and applied. Two distinct questions are presented:
>
> > (1) Was the police checkpoint at issue implemented pursuant to a checkpoint program that

had, when viewed at that programmatic level, an appropriate primary purpose other than general crime control?

(2) If so, was the decision to implement that specific checkpoint made by a supervisor in advance rather than by an officer in the field?

*Brown*, 293 Ga. at 798-799 (emphasis in original; footnotes omitted). Correctly analyzed, the decision to implement the checkpoint at which Appellant was stopped was properly made by a supervisor in advance, but the State failed to prove that the BCSO's checkpoint program had an appropriate primary purpose other than general crime control.

(a) *Supervisory Implementation.* In *Brown*, the trial court found that the State failed to prove that a supervisor made the decision to implement the roadblock at issue there in advance rather than as an officer in the field, and we hold that the Court of Appeals erred in failing to defer to that factual finding when it reversed the trial court's suppression order. See *Brown*, 293 Ga. at 802-804. In this case, the trial court made the opposite finding, concluding that Sergeant Jordan "decided the time and place for the roadblock and authorized its implementation as a supervisor, and not a field officer." We must defer to that finding if there is any evidence in the record to support it, see id. at 803 — and there was.

It is undisputed that Sergeant Jordan was the supervisor of the BCSO HEAT Unit and its two other officers, that the BCSO gave Sergeant Jordan the authority to implement vehicle checkpoints under its roadblock policy, and that Sergeant Jordan was the BCSO official who decided to implement the specific checkpoint at which Appellant was stopped. But Sergeant Jordan also regularly patrols in the field and participates in checkpoint operations. Thus, the issue is *when* Sergeant Jordan made the implementation decision — as a supervisor in advance, or as an officer in the field, which creates the risk that the checkpoint was set up spontaneously to target or oppress drivers whom the officer saw on patrol and wanted to stop and question but had no articulable reason to do so. See *Brown*, 293 Ga. at 793.

The checkpoint started at 12:30 a.m. on November 27, 2010. Sergeant Jordan testified that he made the decision "[a]t the beginning of the shift or right as [he] was coming on shift," and Captain Colbert testified that Sergeant Jordan's usual shift started at 7:00 p.m. Deputy Scarborough testified that the sergeant informed him of the checkpoint location several hours in advance, and Sergeant Jordan recalled that he told Deputy Scarborough and the other HEAT

Unit deputy of the location probably about an hour before the operation began. This testimony supports the trial court's finding that Sergeant Jordan "decided the time and place for the roadblock and authorized its implementation as a supervisor, and not a field officer." Accordingly, the Court of Appeals correctly rejected Appellant's challenge to the trial court's order on this ground.

The Court of Appeals was also correct in saying that the assistance Sergeant Jordan provided to his two subordinate officers when traffic backed up at the roadblock, in order to minimize the delay to the public, did not "deprive Jordan of supervisory status" for purposes of the first *LaFontaine* requirement. *Williams*, 317 Ga. App. at 661. As we explain in *Brown*, an otherwise valid checkpoint is not "rendered unconstitutional solely because the supervisor who authorized the checkpoint later participates to some extent in the checkpoint's operation." *Brown*, 293 Ga. at 805, n.15.

We note, however, that the Court of Appeals' assertion, adopted from that court's opinion in *Brown*, that " 'officers are not precluded as a matter of law from acting simultaneously as a supervisor and a field officer,' " *Williams*, 317 Ga. App. at 661, is incorrect insofar as it pertains to the decision to implement a checkpoint. As we emphasize in *Brown*, "the implementation decision must be made in advance by a supervisor acting in that supervisory capacity, not by an officer out in the field who happens also to have supervisory rank." *Brown*, 293 Ga. at 805, n.15.

The Court of Appeals also erred in saying that "in the context of a supervisor who also serves as a field officer, the supervisor must have acted at an *executive programmatic level*, as opposed to as a field officer, at the time he or she issued advance authorization for the roadblock," citing as support the Court of Appeals' decision in *Brown* as well as that court's discussion of *Edmond* and *LaFontaine* in *Baker v. State*, 252 Ga. App. 695, 696-703 (556 SE2d 892) (2001) (whole court). *Williams*, 317 Ga. App. at 662 (emphasis supplied).[2] In *Brown*, we reiterate that "supervisory personnel" as used in *LaFontaine* simply means supervisors, even those at the first level, rejecting the argument "that an officer cannot be classified as 'supervisory personnel' under the first *LaFontaine* requirement unless he exercises 'programmatic-level' authority within his agency or is identified as an 'executive.' " *Brown*, 293 Ga. at 800-802.

---

[2] The phrase "executive programmatic level" actually appears to be derived from the dissent in *State v. Brown*, 315 Ga. App. 154, 162 (726 SE2d 654) (2012) (Mikell, P. J., dissenting) ("The key issue is whether the supervisor is acting as an 'executive level programmatic' official when he or she authorizes — in advance — the roadblock, or whether he or she was then a field officer.").

(b) *Primary Purpose at the Programmatic Level.* The trial court also found that the checkpoint at which Appellant was stopped "was authorized and carried out for a legitimate law enforcement purpose, that is, a sobriety checkpoint." The Court of Appeals deferred to this finding, saying that

> the evidence supports the trial court's finding that [Sergeant] Jordan . . . authorized the roadblock for the legitimate primary purpose decreed by [Captain] Colbert and the stated mission of the HEAT unit to establish a sobriety checkpoint.

*Williams*, 317 Ga. App. at 662.[3] Quoting *Baker*, 252 Ga. App. at 702, the Court of Appeals framed the legal issue as whether in deciding " 'to implement the checkpoint in question . . . the supervisors had a legitimate primary purpose.' " *Williams*, 317 Ga. App. at 662.

However, *Brown* explains how the *Baker* majority opinion incorrectly read *Edmond* as modifying *LaFontaine*'s requirement that a supervisor implement the checkpoint at issue, when *Edmond* actually supplemented *LaFontaine*'s test for evaluating the implementation and operation of the particular checkpoint with a distinct requirement focused on the law enforcement agency's checkpoint program. See *Brown*, 293 Ga. at 798-799. Thus, a finding that a *particular* checkpoint has a primary purpose other than ordinary crime control is not enough to satisfy the *Edmond* requirement.

> *Edmond* requires an examination of the policy purpose of the checkpoints, viewed "at the programmatic level," to ensure that an agency's checkpoints are established primarily for a lawful and focused purpose like traffic safety rather than to detect evidence of ordinary criminal wrongdoing.

*Brown*, 293 Ga. at 796 (quoting *Edmond*, 531 U. S. at 48). In this case, the State failed to prove that the BCSO's checkpoint program was properly limited.

The Cobb County Police Department policy at issue in *Brown* expressly limited vehicle checkpoints to purposes approved by U.S. Supreme Court case law, and expressly prohibited the use of checkpoints for "general crime detection"; there was no dispute that the checkpoint program there complied with *Edmond*. See *Brown*, 293

---

[3] As we note in *Brown*, use of the phrase "legitimate primary purpose" as a shorthand for the holding of *Edmond* is misleading. See *Brown*, 293 Ga. at 795, n.9.

Ga. at 788, 800. By contrast, the BCSO's two-sentence vehicle road-block policy authorizes "general roadblocks which serve legitimate law enforcement purposes," without limitation. "[L]egitimate law enforcement purposes" include such objectives as vehicle safety and driver sobriety — but also include drug interdiction and other measures to detect "evidence of ordinary criminal wrongdoing" and advance "the general interest in crime control," which *Edmond* held cannot justify a regime of suspicionless vehicle stops. See 531 U. S. at 42; *Brown*, 293 Ga. at 797 ("[I]f the primary purpose of the checkpoint program is crime-fighting in general, then the checkpoints implemented under that program are unconstitutional . . . ."). Thus, the BCSO's written checkpoint policy, viewed properly at the programmatic level — what checkpoints are authorized by the policy, rather than what the purpose was for any specific checkpoint — is not limited as the Constitution requires.

The Constitution, however, does not mandate that a law enforcement agency delineate its checkpoint program in writing (although a written policy certainly provides clearer guidance to the agency's officers and stronger proof for reviewing courts). We therefore must also consider whether the State offered any other evidence that the primary purpose of the BCSO's vehicle roadblock program was properly limited, such as testimony about restrictions being imposed through verbal orders or training or records showing that checkpoints have been done only for an appropriate purpose. But despite testimony describing the form that the BCSO has for reporting on checkpoints, no such forms were offered into evidence, and indeed the testimony indicated that the "normal routine" was not to make any formal record of checkpoints like the multiple roadblocks that Sergeant Jordan had implemented each week for at least a year. And while testimony indicated that the BCSO checkpoint program *included* sobriety checks, which are an appropriate purpose for vehicle roadblocks, see *Brown*, 293 Ga. at 792, there was no testimony or other evidence that the BCSO program *excluded* checkpoints for purposes of general crime control. The trial court's finding that Captain Colbert delegated to Sergeant Jordan the authority to implement checkpoints "for legitimate and proper law enforcement purposes, *such as* sobriety checks" (emphasis supplied), does not establish that the BCSO's checkpoint program had a primary purpose other than ordinary crime-fighting.[4]

---

[4] Indeed, the trial court recounted Appellant's argument that the checkpoint at which he was stopped was "part of an aggressive use of roadblocks by a field supervisor who has been granted 'unfettered and total discretion to launch a roadblock campaign, to be implemented at

"At a minimum, the State must show that the law enforcement agency's checkpoint program had an appropriate primary purpose other than ordinary crime control" when viewed at the programmatic level. *Brown*, 293 Ga. at 799. The State failed to make that showing in this case, and we therefore must conclude that the checkpoint at which Appellant was stopped violated the Fourth Amendment.[5] Accordingly, the trial court erred in denying Appellant's motion to suppress, and the Court of Appeals erred in upholding the trial court's ruling.

*Judgment reversed. Thompson, C. J., Hines, P. J., Benham, Hunstein, Melton, JJ., and Judge Jerry W. Baxter concur. Blackwell, J., not participating.*

DECIDED OCTOBER 21, 2013.

*Childs & Nolan, Craig M. Childs, Frank H. Childs, Jr., William H. Noland*, for appellant.

*Rebecca H. L. Grist, Solicitor-General, Cynthia T. Adams, Assistant Solicitor-General*, for appellee.

S13Y0219, S13Y0220, S13Y0221. IN THE MATTER OF JAMES F. STECKBAUER (three cases).
(750 SE2d 363)

---

his pleasure without any direction or any duty to report his activities,'" and the court said that "[i]t seems difficult to conceive of a plan to use roadblocks as aggressively as is being done by the H.E.A.T. unit that would be any closer to the line of what would meet current minimum constitutional standards for roadblocks." To the extent that vehicle checkpoints become widespread, routine, and unregulated, that may suggest that the primary purpose of the agency's checkpoint program is actually general crime control in violation of *Edmond*, or that checkpoints are arbitrary and oppressive in view of the totality of the circumstances. See *Brown*, 293 Ga. at 806.

[5] To be clear, our holding is based on the very limited evidence presented in this case regarding the BCSO vehicle roadblock program and its purposes. We do not foreclose the possibility that in other cases the State may be able to present testimony or documents showing that the BCSO checkpoint program has an appropriate primary purpose other than general crime control.