**WHOLE COURT**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 18, 2016**

# In the Court of Appeals of Georgia

A16A1338. KETTLE v. THE STATE.

RICKMAN, Judge.

Christopher Kettle appeals the trial court's denial of his motion to suppress evidence obtained after his vehicle was stopped at a roadblock. He contends that his consent to a blood test was not free and voluntary and that the roadblock was unlawful. For reasons that follow, we affirm.

Our task when reviewing a trial court's ruling on a motion to suppress must be limited in nature. The trial court sits as the trier of fact and when the trial court has made express findings of disputed facts, we must accept those findings unless they are clearly erroneous, construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and generally limit our consideration of the disputed facts to those expressly found by the trial court.

(Citations and footnotes omitted.) *Hughes v. State*, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). With respect to questions of law, we owe no deference to the trial court, and instead, must apply the law ourselves to the material facts. Id. at 750 (2).

The evidence presented at the motion to suppress hearing, construed in favor of the trial court's factual findings, showed that on May 25, 2014, at "around 2:50 a.m.," the vehicle Kettle was driving was stopped at a road block conducted by the Georgia State Patrol. A corporal with the Georgia State Patrol asked Kettle for his driver's license and noticed an odor of marijuana coming from the vehicle and that Kettle had a slow pattern to his speech. When asked about the odor of marijuana, either Kettle or his wife stated that he had smoked marijuana earlier that day. The corporal asked Kettle to exit the vehicle for field sobriety tests, and Kettle complied. During those tests, the corporal observed that Kettle's eyes were bloodshot, his pupils appeared to be dilated, and he was unable to maintain his balance. Based on the corporal's training and experience and his observation of Kettle, he determined that Kettle was under the influence of marijuana to the extent he was a less safe driver.

At that point, the corporal placed Kettle under arrest and read him an implied consent notice, which stated:

Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your blood under the implied consent law?

After reading him the notice, the corporal asked Kettle if he would submit to a state test of his blood, and Kettle said that he would. The corporal did not threaten Kettle or raise his voice, and Kettle never changed his mind about submitting to the test. Kettle testified that when the corporal asked him about the blood test, he inquired about whether his wife would be able to leave. The corporal asked whether she had "been drinking or doing anything," to which Kettle replied, "no, sir." After speaking with Kettle's wife, the corporal told Kettle that she was going to be free to leave.

1. Relying on *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015), Kettle contends that his consent to the blood test was not free and voluntary, and therefore the blood test should have been suppressed.

> A suspect's right under the Fourth Amendment to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution. In general, searches are of two types: those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.

(Citations omitted.) *Williams*, 296 Ga. at 819. One of those exceptions is the voluntary consent exception and "it is well settled in the context of a DUI blood draw that a valid consent to a search eliminates the need for either probable cause or a search warrant." (Citations omitted.) Id. at 821.

In *Williams*, the Supreme Court of Georgia recognized that an affirmative response to the implied consent notice does not automatically equate with actual consent to a search within the meaning of the Fourth Amendment. Id. at 821-822. Instead, "when relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the

4

totality of the circumstances." (Citations, punctuation, and footnote omitted.) Id. at 821-822.

> A "totality of the circumstances" analysis is not new to Georgia courts. A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent. Nor may consent be coerced, by explicit or implicit means, by implied threat or covert force. Other factors to be considered are prolonged questioning[,] the accused's age, level of education, intelligence and advisement of constitutional rights.

(Citations and punctuation omitted.) *Kendrick v. State*, 335 Ga. App. 766, 769 (782 SE2d 842) (2016).

Here, there is no evidence that the corporal used fear, intimidation, threats or lengthy detention to obtain the consent. The evidence shows that it was a civilized encounter – Kettle was very polite the entire time and the corporal did not raise his voice or threaten Kettle at any point. Kettle does not contend that his age, level of education or intelligence hindered his ability to voluntarily consent. His argument is that he only agreed to the blood test so that the corporal would allow his wife to leave. The evidence shows, however, that the corporal's willingness to let Kettle's wife leave was based on the corporal's conclusion that she was not impaired and not

5

as an inducement for Kettle to submit to the blood test. Based on the totality of the circumstances, we conclude that the State met its burden of proving that Kettle's consent to submit to a state test of his blood was voluntary. See *State v. Young*, ___ Ga. App. ___, No. A16A1435 (November 2, 2016) (State met its burden of proving that suspect voluntarily consented to breath test under the totality of the circumstances where evidence showed suspect immediately verbally agreed to submit to the requested breath test, and there was no evidence of any coercive circumstances that would undercut the voluntariness of her consent).

2. Kettle contends that the roadblock was unconstitutional because the Georgia State Patrol's road check policy was not properly limited to a primary purpose other than general crime control.

When a constitutional challenge to a police checkpoint focuses on the sufficiency of the policy under which the checkpoint was implemented, two distinct questions are presented for resolution by a trial court:

(1) Was the police checkpoint at issue implemented pursuant to a checkpoint program that had, when viewed at that programmatic level, an appropriate primary purpose other than general crime control?

(2) If so, was the decision to implement that specific checkpoint made by a supervisor in advance rather than by an officer in the field?

6

(Punctuation omitted.) *Williams v. State*, 293 Ga. 883, 888-89 (3) (750 SE2d 355) (2013), quoting *Brown v. State*, 293 Ga. 787, 799 (2) (e) (750 SE2d 148) (2013). With respect to the first question, which is at issue here, a primary purpose is "appropriate" if it is "both legitimate for law enforcement to pursue *and* can be distinguished from general crime control." (Emphasis in original.) *Brown*, 293 Ga. at 795 (2) (c), n.9.

As found by the trial court , the Georgia State Patrol's policy on roadblocks consisted not only of the 2010 Policy Number 17.05, which provides that "[s]upervisors will schedule road checks and will identify a primary purpose for the road check such as: to verify driver licenses, insurance, vehicle registration, and vehicle equipment," but also of Form DPS-206, which provides that Georgia State Patrol troopers can establish and participate in lawfully authorized roadblocks for the legitimate primary purpose of improving driving safety and more specifically to perform routine traffic checks for several listed reasons.

In addition to or in lieu of a written policy, the State may offer other evidence that the primary purpose of a law enforcement agency's vehicle roadblock program was properly limited, "such as testimony about restrictions being imposed through verbal orders or training." *Williams*, 293 Ga. at 892 (3) (b). Here, a lieutenant with

7

the Georgia State Patrol, who was a post commander at the time the roadblock at issue was implemented, specifically testified that Georgia State Patrol policy required that Form DPS-206 be filled out for every roadblock and that the permissible purposes, as shown on the form, were to check: driver's license, insurance, registration verification, seatbelt compliance, driver impairment, vehicle fitness, vehicle safety/vehicle safety compliance, location of dangerous felon likely to take designated route, and other. He explained that the use of the "other" category on that form was limited to describing the details of a specific search for a violent felon. The lieutenant also testified that, based on the training he had received and orders he had been given, using a roadblock for general crime deterrence would not be in compliance with Georgia State Patrol roadblock policy and could subject a supervisor to administrative discipline. He further testified that during his time with the Georgia State Patrol (approximately 19 years), a roadblock had never been used for general crime deterrence.

Construed in favor of the trial court's factual findings and judgment, the evidence showed that the Georgia State Patrol's roadblock policy allowed routine traffic checks for a specific list of legitimate purposes and that the use of checkpoints for general crime deterrence would be prohibited. Thus, the trial court was authorized

to conclude that the State presented adequate proof that the Georgia State Patrol roadblock program, when viewed at the programmatic level, had an appropriate primary purpose other than general crime control. See *Moss v. State*, 333 Ga. App. 875, 877-878 (777 SE2d 709) (2015) (evidence of preprinted checkpoint log and officer's testimony regarding possible purposes for checkpoint was sufficient to support trial court's ruling that primary purpose of checkpoint program was properly limited on programmatic level).[1]

3. Kettle contends that the roadblock was not permissible because the State failed to show that the roadblock was well marked as required by *LaFontaine v. State*, 269 Ga. 251 (497 SE2d 367) (1998).

In *LaFontaine*, the Supreme Court of Georgia held that

---

[1] Kettle also contends that the roadblock was not permissible because the supervising officer failed to designate a single primary purpose, which he argues is required by *City of Indianapolis v. Edmond*, 531 U. S. 32 (121 SCt 447, 148 LEd2d 333) (2000). In *Edmond*, the United States Supreme Court determined that the primary purpose of the Indianapolis checkpoint program at issue was ultimately indistinguishable from the general interest in crime control, and therefore the checkpoints violated the Fourth Amendment. Id. at 48 (III). The Court cautioned "that the purpose inquiry in this context is to be conducted only at the programmatic level. . . ." Id. We fully addressed the primary purpose issue at the programmatic level in Division 2, and Kettle's contention presents nothing further for our review.

9

[a] roadblock is satisfactory where the decision to implement the roadblock was made by supervisory personnel rather than the officers in the field; all vehicles are stopped as opposed to random vehicle stops; the delay to motorists is minimal; the roadblock operation is well identified as a police checkpoint; and the "screening" officer's training and experience is sufficient to qualify him to make an initial determination as to which motorists should be given field tests for intoxication.

(Citation omitted.) Id. at 253 (3).

Here, the supervisor who made the decision to implement the roadblock, and also participated in the roadblock, testified that he completed a final report after the roadblock was concluded, which shows that four uniformed troopers were present at the roadblock, all qualified in DUI detection, that there were three marked patrol cars using blue lights, and that the officers wore reflective vests. Although the report states that cones were used to mark the roadblock, the supervisor testified that they used LED flares. The supervisor also testified that every car was stopped and the delay to motorists was minimal. The corporal who arrested Kettle testified that there were multiple cars involved in the road block and that at least one of the cars had its blue lights illuminated. Although the Kettles testified that they only saw blue lights on an adjacent street, the trial court found that the roadblock was sufficiently

10

identified with uniformed officers, marked vehicles utilizing blue lights, and lighting to direct the flow of traffic.

Construed in favor of the trial court's factual findings and judgment, the evidence authorized the trial court to conclude that the road block was well identified as a police checkpoint as required by *LaFontaine*, 269 Ga. at 253 (3).

*Judgment affirmed. Miller, P. J., Ellington, P. J., Branch, McMillian and Mercier, JJ., concur. Barnes, P. J., McFadden and Boggs, JJ., dissent.*

A16A1338. KETTLE v. THE STATE.

BOGGS, Judge, dissenting.

I disagree with the majority's conclusion in Division 2 that the roadblock satisfied constitutional requirements, and therefore respectfully dissent.

The majority holds that the trial court was authorized to conclude that the State presented adequate proof that the roadblock program, when viewed at the programmatic level, had an appropriate primary purpose other than general crime control. But that is only part of the analysis. Our courts "refer to the '*Edmond*[1] requirement' or the 'appropriate primary purpose requirement' – with 'appropriate' understood to mean a primary purpose that is *both* legitimate for law enforcement to

---

[1] *City of Indianapolis v. Edmond*, 531 U. S. 32 (121 SCt 447, 148 LE2d 333) (2000).

2

pursue *and* can be distinguished from general crime control." (Punctuation omitted; emphasis in original and supplied.) *Brown v. State*, 293 Ga. 787, 795 (2) (c) n.9 (750 SE2d 148) (2013).

Here, the record reveals that GPS's written manual did not state a primary purpose on the programmatic level. The manual provides that "*[s]upervisors will schedule* road checks and *will identify a primary purpose* for the road check *such as*: to verify driver licenses, insurance, vehicle registration, and vehicle equipment." (Emphasis supplied.) This is inadequate to satisfy *Edmond* because 1) a *supervisor* determines the primary purpose rather than the GPS at the programmatic level, 2) the primary purpose is determined on a case-by-case basis because it is identified upon the decision to implement a roadblock ("will schedule road checks and will identify"), and 3) the manual provides only an example of a primary purpose ("such as"), and therefore it fails to state definitively and with limitation the primary purpose of the roadblock program. See, e. g., *Williams v. State*, 293 Ga. 883, 892 (3) (b) (750 SE2d 355) (2013) (the "written checkpoint policy, viewed properly at the programmatic level — what checkpoints are authorized by the policy, rather than what the purpose was for any specific checkpoint — is not limited as the Constitution requires.") In sum, the policy manual did not provide a "primary purpose of the checkpoint

3

*program*." (Footnote omitted; emphasis in original.) *Brown*, supra, 293 Ga. at 796 (2) (d).

To the extent the trial court found in its written order that the "the road block was conducted pursuant to the Georgia State Patrol 2010 Policy and was a programmatic approach," it erred. While the roadblock may have been conducted pursuant to the 2010 policy manual, as explained above, the manual does not set forth the GPS's policy on the programmatic level. The trial court found further that "[t]raffic control is a specific element of that policy" and makes reference to the log form used by the lieutenant for the specific roadblock here. The lieutenant testified that the log form was used for every roadblock. While I agree with the majority (and as the trial court found in its oral ruling ) that this log form is some evidence of GPS's programmatic level roadblock policy, the form itself is open-ended. It contains a space for "other" followed by a blank line, and the lieutenant explained that he had been instructed to use that option only when looking for a dangerous felon, even though "[l]ocation of dangerous felon" was already specifically listed as an option on the form, a fact which the majority ignores.[2] There was no other evidence showing

_____

[2]The majority states that the lieutenant's explanation for the use of "other" was "limited to describing the details of a specific search for a violent felon." But this is an overstatement of his testimony. The lieutenant testified: "The only 'other' that I

4

that "Other" is limited to a proper purpose. Although the lieutenant testified a roadblock would not be permitted for detecting or deterring crime generally, this evidence does not foreclose the possibility that the GPS could supply another improper purpose under "Other." Testimony about the purposes for which the roadblock could *not* be used, does not equate to testimony about the purpose for which the roadblock *could* be used. *Edmond* prohibits purposes that are "ultimately indistinguishable from the general interest in crime control." Supra, 531 U. S. at 43 (III). In the absence of an explanation of what the "other" purposes may be, we cannot determine whether or not those other purposes are in fact indistinguishable from the general interest in crime control. Just as the trial court stated in its oral ruling that "there could be many other specific reasons that are not random investigation for criminal conduct," there could also be many other specific reasons that *are* random investigation for criminal conduct. Without evidence that any programmatic level policy was properly identified and limited, the *Edmond* requirement is not satisfied. As explained in *Brown*, *Edmond* requires a showing of a primary purpose that is *both*

---

can think of was, you know, when we are looking for Jamie Hood [a fugitive] or a violent felon." He explained further, "It's the only time that I ever used 'other,' and the only time I was ever instructed to use 'other' was in times of looking for dangerous felon."

legitimate for law enforcement to pursue *and* can be *distinguished* from general crime control. Supra, 293 Ga. at 795 (2) (c) n.9.

The trial court orally ruled:

> I believe that in addition to the specific route concerned involved in a dangerous criminal that there could be many other specific reasons that are not random investigation for criminal conduct. None of those are involved in this case, so it's not necessary to make that opinion . . . If the policy had specifically addressed and allowed things that clearly are not based upon specific purposes and information, then I would be critical of it, but it does not do so.

Thus, the court found that because this particular roadblock was properly limited, there was no need to provide an opinion as to other purposes not involved in this case. But as explained in *Williams*, a finding that a *particular* checkpoint has a primary purpose other than ordinary crime control is not sufficient to satisfy *Edmond*. Supra, 293 Ga. at 891 (3) (b). The court must conduct an analysis of the programmatic level policy.

The State and the majority cite *Moss v. State*, 333 Ga. App. 875 (777 SE2d 875) (2015). But the facts in *Moss* are distinguishable. There, we held that although the written policy was not in the record before us, the State presented some evidence supporting the trial court's finding that the primary purpose at the programmatic level

6

was properly limited. Id. at 877-878. Specifically, the sergeant's testimony about the *sole purpose* for checkpoints, in conjunction with the log form used for the checkpoint in question, satisfied the requirement. The log form in *Moss* stated under the "Other" box that the check point was established "to ensure driver's [sic] were complying with all applicable driver's license and insurance requirements." Id. Here, however, although an approval form similar to the log in *Moss* was admitted into evidence, there was no explanation given for the purpose of "Other" outside of the one given by the lieutenant referring to a purpose already listed. He referred only to the written policy: "we adhere to the policy and directives that were given to us." And when asked "what are the possible - - not necessarily in this roadblock, but in general, what are the possible reasons for a roadblock that you were able to check?" the lieutenant repeated the reasons listed on the approval form he filled out for this particular checkpoint. He also responded that there was no verbal policy, only the written policy, and that the written policy was "[their] guidance." But again, the written manual provided no properly limited programmatic level roadblock policy.

The GPS policy manual on its face does not provide a primary purpose on the programmatic level, and any evidence of the programmatic level purpose provided by the log form was not properly limited. United States Supreme Court and Georgia

7

Supreme Court precedent requires us to hold that the State failed satisfy the requirement of *Edmond*, supra. I would therefore conclude that the trial court erred in denying Kettle's motion to suppress.[3]

---

[3]I note that in June 2014, following the Georgia Supreme Court's 2013 decisions in *Brown* and *Williams*, and prior to the 2015 hearing on Kettle's motion to suppress, the GPS revised its policy manual. The manual now provides under "Roadblocks":

> The supervisor must implement the roadblock for a legitimate primary purpose, *which shall be to* monitor and check driver's licenses, driver condition, vehicle registration, vehicle equipment and other requirements of the Georgia motor vehicle and traffic code or to locate a suspected criminal likely to be in the area. *The primary purpose shall not be general crime detection.*

(Emphasis supplied.) The "Policy" statement was also revised and now provides:

> The Georgia Department of Public Safety shall conduct roadblocks to protect the citizens of the State of Georgia and to monitor and check driver's licenses, driver condition, vehicle registrations, vehicle equipment and other requirements of the Georgia motor vehicle and traffic code and to locate a suspected criminal likely to be in the area. Roadblocks shall be conducted in a manner that safely maximizes available personnel, promotes highway safety and provides the greatest public benefit. *Roadblocks shall not be established for the general purpose of crime control or deterrence.*

8

I am authorized to state that Presiding Judge Barnes and Judge McFadden join in this dissent.

---

(Emphasis supplied.)