Rickman, Judge.
Christopher Kettle appeals the trial court’s denial of his motion to suppress evidence obtained after his vehicle was stopped at a roadblock. He contends that his consent to a blood test was not free and voluntary and that the roadblock was unlawful. For reasons that follow, we affirm.
Our task when reviewing a trial court’s ruling on a motion to suppress must be limited in nature. The trial court sits as the trier of fact and when the trial court has made express findings of disputed facts, we must accept those findings unless they are clearly erroneous, construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and generally limit our consideration of the disputed facts to those expressly found by the trial court. Hughes v. State, 296 Ga. 744, 746 (1) (770 SE2d 636) (2015). With respect to questions of law, we owe no deference to the trial court, and instead, must apply the law ourselves to the material facts. Id. at 750 (2).
The evidence presented at the motion to suppress hearing, construed in favor of the trial court’s factual findings, showed that on May 25, 2014, at “around 2:50 a.m.,” the vehicle Kettle was driving was stopped at a roadblock conducted by the Georgia State Patrol. A corporal with the Georgia State Patrol asked Kettle for his driver’s license and noticed an odor of marijuana coming from the vehicle and that Kettle had a slow pattern to his speech. When asked about the odor of marijuana, either Kettle or his wife stated that he had smoked marijuana earlier that day The corporal asked Kettle to exit the vehicle for field sobriety tests, and Kettle complied. During those tests, the corporal observed that Kettle’s eyes were bloodshot, his pupils appeared to be dilated, and he was unable to maintain his balance. Based on the corporal’s training and experience and his observation of Kettle, he determined that Kettle was under the influence of marijuana to the extent he was a less safe driver.
At that point, the corporal placed Kettle under arrest and read him an implied consent notice, which stated:
Georgia law requires you to submit to state administered chemical tests of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver’s license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required *613 testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver’s license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state tests, you are entitled to additional chemical tests of your blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical tests of your blood under the implied consent law?
After reading him the notice, the corporal asked Kettle if he would submit to a state test of his blood, and Kettle said that he would. The corporal did not threaten Kettle or raise his voice, and Kettle never changed his mind about submitting to the test. Kettle testified that when the corporal asked him about the blood test, he inquired about whether his wife would be able to leave. The corporal asked whether she had “been drinking or doing anything,” to which Kettle replied, “no, sir.” After speaking with Kettle’s wife, the corporal told Kettle that she was going to be free to leave.
1. Relying on Williams v. State, 296 Ga. 817 (771 SE2d 373) (2015), Kettle contends that his consent to the blood test was not free and voluntary, and therefore the blood test should have been suppressed.
A suspect’s right under the Fourth Amendment to be free of unreasonable searches and seizures applies to the compelled withdrawal of blood, and the extraction of blood is a search within the meaning of the Georgia Constitution. In general, searches are of two types: those conducted with a search warrant or those undertaken without one, and searches conducted outside the judicial process are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions.
(Citations omitted.) Williams, 296 Ga. at 819. One of those exceptions is the voluntary consent exception, and “it is well settled in the context of a DUI blood draw that a valid consent to a search eliminates the need for either probable cause or a search warrant.” (Citations omitted.) Id. at 821.
In Williams, the Supreme Court of Georgia recognized that an affirmative response to the implied consent notice does not automatically equate with actual consent to a search within the meaning of the *614 Fourth Amendment. Id. at 821-822. Instead, “when relying on the consent exception to the warrant requirement, the State has the burden of proving that the accused acted freely and voluntarily under the totality of the circumstances.” (Citations, punctuation and footnote omitted.) Id. at 821-822.
A “totality of the circumstances” analysis is not new to Georgia courts. A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent. Nor may consent be coerced, by explicit or implicit means, by implied threat or covert force. Other factors to be considered are prolonged questioning!)] the accused’s age, level of education, intelligence and advisement of constitutional rights [.]
(Citations and punctuation omitted.) Kendrick v. State, 335 Ga. App. 766, 769 (782 SE2d 842) (2016).
Here, there is no evidence that the corporal used fear, intimidation, threats or lengthy detention to obtain the consent. The evidence shows that it was a civilized encounter — Kettle was very polite the entire time, and the corporal did not raise his voice or threaten Kettle at any point. Kettle does not contend that his age, level of education or intelligence hindered his ability to voluntarily consent. His argument is that he only agreed to the blood test so that the corporal would allow his wife to leave. The evidence shows, however, that the corporal’s willingness to let Kettle’s wife leave was based on the corporal’s conclusion that she was not impaired and not as an inducement for Kettle to submit to the blood test. Based on the totality of the circumstances, we conclude that the State met its burden of proving that Kettle’s consent to submit to a state test of his blood was voluntary See State v. Young, 339 Ga. App. 306 (793 SE2d 186) (2016) (State met its burden of proving that suspect voluntarily consented to breath test under the totality of the circumstances where evidence showed suspect immediately verbally agreed to submit to the requested breath test, and there was no evidence of any coercive circumstances that would undercut the voluntariness of her consent).
2. Kettle contends that the roadblock was unconstitutional because the Georgia State Patrol’s road check policy was not properly limited to a primary purpose other than general crime control.
When a constitutional challenge to a police checkpoint focuses on the sufficiency of the policy under which the checkpoint was imple *615 mented, two distinct questions are presented for resolution by a trial court:
(1) Was the police checkpoint at issue implemented pursuant to a checkpoint program that had, when viewed at that programmatic level, an appropriate primary purpose other than general crime control?
(2) If so, was the decision to implement that specific checkpoint made by a supervisor in advance rather than by an officer in the field?
(Punctuation omitted.) Williams v. State, 293 Ga. 883, 888-889 (3) (750 SE2d 355) (2013), quoting Brown v. State, 293 Ga. 787, 799 (2) (e) (750 SE2d 148) (2013). With respect to the first question, which is at issue here, a primary purpose is “appropriate” if it is “both legitimate for law enforcement to pursue and, can be distinguished from general crime control.” (Emphasis in original.) Brown, 293 Ga. at 795 (2) (c), n. 9.
As found by the trial court, the Georgia State Patrol’s policy on roadblocks consisted not only of the 2010 Policy Number 17.05, which provides that “[supervisors will schedule road checks and will identify a primary purpose for the road check such as: to verify driver licenses, insurance, vehicle registration, and vehicle equipment,” but also of Form DPS-206, which provides that Georgia State Patrol troopers can establish and participate in lawfully authorized roadblocks for the legitimate primary purpose of improving driving safety and more specifically to perform routine traffic checks for several listed reasons.
In addition to or in lieu of a written policy, the State may offer other evidence that the primary purpose of a law enforcement agency’s vehicle roadblock program was properly limited, “such as testimony about restrictions being imposed through verbal orders or training.” Williams, 293 Ga. at 892 (3) (b). Here, a lieutenant with the Georgia State Patrol, who was a post commander at the time the roadblock at issue was implemented, specifically testified that Georgia State Patrol policy required that Form DPS-206 be filled out for every roadblock and that the permissible purposes, as shown on the form, were to check: driver’s license, insurance, registration verification, seatbelt compliance, driver impairment, vehicle fitness, vehicle safety/ vehicle safety compliance, location of dangerous felon likely to take designated route, and other. He explained that the use of the “other” category on that form was limited to describing the details of a specific search for a violent felon. The lieutenant also testified that, based on the training he had received and orders he had been given, using a *616 roadblock for general crime deterrence would not be in compliance with Georgia State Patrol roadblock policy and could subject a supervisor to administrative discipline. He further testified that during his time with the Georgia State Patrol (approximately 19 years), a roadblock had never been used for general crime deterrence.
Construed in favor of the trial court’s factual findings and judgment, the evidence showed that the Georgia State Patrol’s roadblock policy allowed routine traffic checks for a specific list of legitimate purposes and that the use of checkpoints for general crime deterrence would be prohibited. Thus, the trial court was authorized to conclude that the State presented adequate proof that the Georgia State Patrol roadblock program, when viewed at the programmatic level, had an appropriate primary purpose other than general crime control. See Moss v. State, 333 Ga. App. 875, 877-878 (777 SE2d 709) (2015) (evidence of preprinted checkpoint log and officer’s testimony regarding possible purposes for checkpoint was sufficient to support trial court’s ruling that primary purpose of checkpoint program was properly limited on programmatic level).[1]
3. Kettle contends that the roadblock was not permissible because the State failed to show that the roadblock was well marked as required by LaFontaine v. State, 269 Ga. 251 (497 SE2d 367) (1998).
In LaFontaine, the Supreme Court of Georgia held:
A roadblock is satisfactory where the decision to implement the roadblock was made by supervisory personnel rather than the officers in the field; all vehicles are stopped as opposed to random vehicle stops; the delay to motorists is minimal; the roadblock operation is well identified as a police checkpoint; and the “screening” officer’s training and experience is sufficient to qualify him to make an initial determination as to which motorists should be given field tests for intoxication.
(Citation omitted.) Id. at 253 (3).
*617 Here, the supervisor who made the decision to implement the roadblock, and also participated in the roadblock, testified that he completed a final report after the roadblock was concluded, which shows that four uniformed troopers were present at the roadblock, all qualified in DUI detection, that there were three marked patrol cars using blue lights, and that the officers wore reflective vests. Although the report states that cones were used to mark the roadblock, the supervisor testified that they used LED flares. The supervisor also testified that every car was stopped and the delay to motorists was minimal. The corporal who arrested Kettle testified that there were multiple cars involved in the roadblock and that at least one of the cars had its blue lights illuminated. Although the Kettles testified that they only saw blue lights on an adjacent street, the trial court found that the roadblock was sufficiently identified with uniformed officers, marked vehicles utilizing blue lights, and lighting to direct the flow of traffic.
Construed in favor of the trial court’s factual findings and judgment, the evidence authorized the trial court to conclude that the roadblock was well identified as a police checkpoint as required by LaFontaine, 269 Ga. at 253 (3).

Judgment affirmed.

Miller, P. J., Ellington, P. J., Branch, McMil-lian and Mercier, JJ., concur. Barnes, P. J., McFadden and Boggs, JJ., dissent.

 Kettle also contends that the roadblock was not permissible because the supervising officer failed to designate a single primary purpose, which he argues is required by City of Indianapolis v. Edmond, 531 U. S. 32 (121 SCt 447, 148 LE2d 333) (2000). In Edmond, the United States Supreme Court determined that the primary purpose of the Indianapolis checkpoint program at issue was ultimately indistinguishable from the general interest in crime control, and therefore the checkpoints violated the Fourth Amendment. Id. at 48 (III). The Court cautioned “that the purpose inquiry in this context is to be conducted only at the programmatic level....” Id. We fully addressed the primary purpose issue at the programmatic level in Division 2, and Kettle’s contention presents nothing further for our review.